IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VENCIL GREEN,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>vs.<br><br>DR. LARRY N. FERGUSON, et. al.,<br><br>　　　　　　　　　　　　　Defendants. | Case No. 1:10-cv-01768 AWI JLT (PC)<br><br>**FINDINGS AND RECOMMNENDATION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>(Doc. 38) |

Plaintiff Vencil Green has been in custody for decades and throughout this time, he has received mental health treatment for various diagnoses including exhibitionism. For about 15 months in 2009 and 2010, Plaintiff was excluded from the the Exhibitionism Treatment Program at Corcoran State Prison. He contends this was done in retaliation for filing a grievance against Defendant Lackovic and, he asserts further, that the denial of exhibitionism treatment amounts to a violation of the Eighth Amendment.

Before the Court is Defendants motion for summary judgment. (Doc. 38) Plaintiff filed extensive opposing papers (Docs. 41, 42, 43, 44, 45), to which Defendants have replied. (Doc. 48) For the reasons set forth below, the Court recommends that Defendant's motion for summary judgment be **GRANTED**.

///

///

**I.     BACKGROUND**

    **A.     Procedural History**

Plaintiff initiated this case on September 27, 2010. (Doc. 1) The Court screened his initial complaint and ordered Plaintiff to notify the Court whether he wished to proceed on the cognizable claims or whether he wished to file an amended complaint. (Doc. 8) On August 12, 2011, Plaintiff notified the Court that he wished to proceed only on the cognizable claims. (Doc. 12) Thus, the Court dismissed the remaining claims and ordered service of the complaint as to Defendants Ferguson and Lackovic only. (Docs. 13, 14, 15) At issue are claims for inadequate medical care in violation of the Eighth Amendment and for retaliation in violation of the First Amendment. (Doc. 15)

    **B.     Factual Background**

Plaintiff was transferred to California State Prison, Corcoran on October 29, 2008, to allow him to obtain treatment for his exhibitionist tendencies. Fact 1.[1] Toward this end, Defendant Lackovic met with Plaintiff on November 13, 2008 to assess his condition. Fact 8. Dr. Lackovic is a psychologist who, at the time, was the primary clinician assigned to the Exhibitionism Treatment Program at Corcoran. Fact 2.

On November 13, 2008, Dr. Lackovic diagnosed Plaintiff with exhibitionism, poly-substance above and an antisocial personality disorder. Fact 8. Plaintiff had been in custody since 1983, by this time, had been diagnosed with exhibitionism by many medical professionals though an equal number believed that his tendency to expose himself was attributable to other mental conditions or disorders. Fact 7.

Dr. Lackovic next saw Plaintiff on January 7, 2009. Fact 9. On that date, he refused to leave his cell for individual treatment because he was required to wear an "exposure-control suit." Fact 9, Doc. 38-5 at 14-15. This suit is made in such a way as to prevent an inmate from

---

[1] The Court refers to the Statement of Undisputed Facts (Doc. 38-2) by referencing the specific Fact at issue. The Court refers only to Facts or portions thereof that are not disputed by Plaintiff or to Facts which are deemed undisputed based upon Plaintiff's failure to provide evidence that a genuine dispute of fact exists.
    Toward this end, the Court **OVERRULES** Plaintiff's objection to the declarations of Ferguson and Lackovic because he fails to demonstrate why they are not admissible.

2

exposing himself to others.  Fact 10.  By this time, Plaintiff had received a rules violation report for exposing himself and was facing an upcoming disciplinary hearing.  Fact 9; Doc. 38-5 at 16. Because Plaintiff would not leave his cell, Dr. Lackovic counseled him through his cell door to use coping skills he had learned through earlier treatment to deal with his anxiety and stress caused by the upcoming disciplinary hearing.  Fact 11.

Once again on January 20, 2009, Plaintiff was supposed to have one-on-one counseling with Dr. Lackovic but he was not permitted to attend because custody staff had discovered that Plaintiffs exposure control-suit had a hole in the groin area.  Fact 12.  The next day, Dr. Lackovic received a letter from Plaintiff in which he expressed that he was hearing voices which instructed him to hurt or kill any cellmate placed with him.  Fact 15; Doc. 38-3 at 21-22.  He reiterated his need for single-cell status by detailing his past acts of predation and his intent to impose harm on any inmate placed in the cell with him.  Doc. 38-3 at 21-22.  Due to Plaintiff's emotional upset, Dr. Lackovic consulted with Ferguson, the supervising psychologist of the Exhibitionism Treatment Program ("ETP"), and Plaintiff's case manager and, ultimately, referred Plaintiff to a psychiatrist for a medical evaluation.  Fact 14.

On January 22, 2009, Dr. Lackovic was meeting with other inmates in Plaintiff's housing unit when she heard a pounding noise coming from Plaintiff's cell and learned that he was angry because he was required to wear the exposure-control suit in order to be released to the yard.  Fact 16.  Custodial staff reported to Dr. Lackovic that Plaintiff tended to escalate his expressions of anger when he was not permitted to manipulate the rules.  Fact 16.  As a result, Dr. Lackovic consulted with Ferguson again and then decided to refer Plaintiff for a new psychiatric evaluation with Dr. Humeid.  Fact 16.

On January 27, 2009, Plaintiff attended a group therapy session for exhibitionism and afterward, he met with Dr. Lackovic for one-on-one counseling.  Facts 18, 19.  During this session, Dr. Lackovic discussed with Plaintiff various issues including problem solving, coping, appropriate conduct and complying with prison rules.  Fact 20.  Dr. Lackovic asked Plaintiff to complete an exercise in which she asked him to visualize a lemon as a means of distracting his attention away from the exhibitionist conduct.  Id.  However, at the end of the exercise, Plaintiff

reported that he had ejaculated in his exposure-control suit. Id. Officers examined the suit and determined that Plaintiff had attempted to tear out a seam in the groin area. Id. As a result of this session and his previous contacts with Plaintiff, Dr. Lackovic opined that Plaintiff was "cycling" into a manic/bipolar condition. Fact 21. Dr. Lackovic reported her conclusions and the bases therefore to Ferguson. Id. After this session, Plaintiff filed a 602 grievance against Dr. Lackovic and claimed that she positioned her body in order to taunt him sexually.[2]

On January 29, 2009, Plaintiff appeared before the Interdisciplinary Treatment Team ("IDTT"). Facts 4, 23. The IDTT is made up of a team of mental health professionals who discuss the inmate's condition and determines the appropriate course of treatment. Fact 5. Dr. Lackovic presented her findings and conclusions to the IDTT and recommended that the IDTT transfer Plaintiff to the "enhanced outpatient" ("EOP") level of care so that Plaintiff's mood swings and exhibitionism could be more closely monitored. Id. She explained that the EOP level of care would continue to provide Plaintiff with one-on-one treatment sessions with his case manager. Id. In addition to the weekly sessions with the case manager, those inmates in the EOP may receive up to ten hours of group counseling per week. Fact 24. Indeed, while in the EOP, Plaintiff received regular treatment for his mental health disorders and group therapy. Facts 25, 26. During this time, Dr. Lackovic had no contact with Plaintiff. Fact 25.

While still within the EOP level of care, from March 2 through March 7, 2009, Plaintiff received six disciplinary reports because he exposed himself. Fact 27. As a result, he was hospitalized in a "crisis bed." Id. On March 6, 2009, Dr. Ahlmeyer interviewed Plaintiff in connection with a recent rules violation report and concluded that the acts of indecent exposure were "volitional (sexual arousal due to hypersensitivity) and related to his Axis II disorder, Not Exhibitionism." (Doc. 38-5 at 35) On this same date, Dr. Lowe opined that Plaintiff should remain in the EOP. (Doc. 38-5 at 36) Nevertheless, on March 11, 2009, Plaintiff's case manager changed his primary diagnosis to exhibitionism and subsequently, the IDTT returned him to the

---

[2] Plaintiff claimed that Dr. Lackovich exposed her "vagina print" to him which, apparently, means that she sat in such a way that allowed him to see the crotch of her legs because she was wearing pants and she did not have her legs crossed. (Doc. 45 at 65; Doc. 38-5 at 120-121)

Correctional Clinical Case Management System ("CCCMS"), which provided a lower level of care. Facts 3, 28. The informational chrono related to this indicated that Plaintiff would be offered "appropriate treatment." (Doc. 38-5 at 39)

On March 13, 2009, Dr. Ahlmeyer interviewed Plaintiff in connection with another recent rules violation report in which he masturbated while having his blood drawn and demanded to see the sergeant. (Doc. 38-5 at 38) Dr. Ahlmeyer concluded that, "Mr. Green's behavior was volitional (sexual arousal due to hypersexuality & power/control to speak with the SRGT) and related to his Axis II disorder, not Exhibitionism. However, some data suggest a Rule Out diagnosis of Paraphilia NOS regarding the public masturbation issues." Id.

Given his transfer back to CCCMS, Plaintiff requested that he be returned to treatment with Dr. Lackovic. Fact 29. Plaintiff reported that he believed that Dr. Lackovic had a "profound" understanding of how to treat him where other therapists did not. Id. On April 7, 2009, Lackovic was called to Plaintiff's cell because he was expressing suicidal ideations. Fact 31. Plaintiff refused to talk with Lackovic but she observed that he was in emotional turmoil. Id. She learned that a week before he had exposed himself to staff members, bit a staff member and spit at an officer. Id. Dr. Lackovic referred him to the hospital to be admitted to a "crisis bed;" however, he was not admitted.

On April 7, 2009, Dr. Bola evaluated Plaintiff because he had reported that he was suicidal. (Doc. 38-5 at 45-47) At this time, Dr. Bola found that Plaintiff was not "gravely disabled" and did not find evidence that he was suicidal. Id. at 46. Dr. Bola opined that Plaintiff's primary diagnosis was "Psychotic disorder NOS by history and Exhibitionism by history." Id. Her Axis II diagnosis was "Antisocial traits." Id.

Despite Dr. Bola's conclusions two days before on April 9, 2009, Plaintiff was again in the emergency room. Fact 33. Plaintiff displayed paranoia and cycling mood swings. Id. Lackovic was called to attend to him because she was the only clinician available. Id. Plaintiff claims during this contact, Dr. Lackovic told him that he would not permit him to receive treatment for exhibitionism while he remained housed at Corcoran because he had filed the grievance against her. (Doc. 45 at 68)

Dr. Flavan, the psychiatrist assigned to the emergency room on April 9, 2009, determined that Plaintiff was, indeed, gravely disabled (Doc. 38-5 at 50) and obtained an order that Plaintiff be involuntarily medicated. Facts 34-35. Dr. Bola agreed. (Doc. 38-5 at 54) Dr. Bola noted that Plaintiff complained that "his therapist is attempting to cause him an 'exotic experience' (orgasm). Delusions of women relating to him on strictly sexualized basis." Id. Dr. Flavan determined Plaintiff's primary diagnosis was "Bipolar Disorder –most recent episode manic" and polysubstance abuse. (Doc. 38-5 at 55) On Axis II, her diagnosis was "Antisocial personality disorder." Id.

Plaintiff remained hospitalized April 9, through April 21, 2009. Fact 35. In addition, he remained involuntarily medication from April 9, 2009 through May 19, 2010. Facts 35, 42; Doc. 38-3 at 39. During his period of hospitalization, Dr. Flavan and another mental health professional, Dr. Talisman, diagnosed Plaintiff with bipolar disorder and exhibitionism and other conditions. Id. Nevertheless, during this period, Plaintiff sent Lackovic letters asking to return to the ETP group therapy. Fact 36. However, Lackovic did not have the authority to admit him to the group absent a determination by the IDTT. Id.

On April 16, 2009, Plaintiff reported that the medicine had "kicked in" and agreed that "I am not exposing myself because of the meds." (Doc. 38-5 at 52) On April 23, 2009, Plaintiff sent Dr. Lackovic a letter indicating that he was compliant with his medication asked to be returned to group therapy for exhibitionism treatment. (Doc. 38-5 at 67) Dr. Lackovic referred the letter to his case manager. Id. at 66.

On April 30, 2009, Plaintiff appeared before the IDTT to determine his needed level of care. Fact 37. During the session, Plaintiff accused Lackovic of sending him to the "crisis bed" by falsely asserting that he was suicidal and that she was denying him treatment. Id. He accused other staff, including Dr. Flavan, for plotting against him. Id.

On May 6, 2009, along with a witness—psychologist, Dr. Ruff, who made notes of the interview (Doc. 38-5 at 70-71)---Ferguson met with Plaintiff about two grievances he filed

including the one that Lackovic exposed her crotch to him.[3] Fact 39. However, Plaintiff refused to cooperate with the interview and refused to listen to Ferguson's explanation why he did not believe that Plaintiff should be in group therapy. Id. Plaintiff reported to Ferguson that he wanted to obtain a certificate showing his completion of the ETP and asserted that he could be an asset to the group. Doc. 38-3 at 3. Ferguson determined there was no credible evidence that Lackovic acted inappropriately with Plaintiff or that she made inappropriate medical decisions for him and reaffirmed his own opinion that Plaintiff should not be engaged in group therapy. Fact 39. Instead, Ferguson determined Plaintiff should remain in individual treatment. Id.

Plaintiff claims that during this meeting with Dr. Ferguson on May 6, 2009, Ferguson told him that he "didn't appreciate the context" of his grievance and that Plaintiff would be precluded from the exhibitionism group treatment indefinitely. (Doc. 45 at 68)

Once again, on May 21, 2009, Plaintiff appeared before the IDTT. Fact 41, Doc. 45 at 62. Plaintiff's case manager reported that Plaintiff's diagnosis was bipolar disorder and antisocial personality disorder. Id. The IDTT determined that Plaintiff did not meet the criteria for the ETP and removed him from the ETP and indicated that he would "be monitored at the CCCMS level of care." Id.; Doc. 38-5 at 76. The IDTT continued him in individual therapy. Id. In addition, the Coleman[4] monitors determined that Plaintiff remaining in individual therapy was appropriate. Fact 43. The monitor noted,

> This is a man who has -- presents with substantial access to qualities, he has a history of involvement in several incidents of exhibitionism while here. He also has a history of involvement in the exhibition treatment program here, and within that context was very abusive to staff and as a result was eventually excluded from the program because of his abuse, and also because he seem to use that as a way or a forum in which to – in which to raise havoc basically. He had went through a lot of attempts to get back into the – into the exhibitionism treatment program. At this point he is involved in a weekly one-to-one therapy program to address impulse control issues and given this guy's history with respect to the misuse of the group format and his presenting issues, this seems to be a very appropriate treatment program for him.

---

[3] One was related to the claim that Dr. Lackovic displayed sexualized conduct on January 27, 2009 and the second claimed that he was being denied the "full spectrum" of services. Doc. 38-3 at 3)

[4] In Coleman v. Schwarzenegger, CIV S-90-0520 LKK JFM, a class of mentally ill inmates incarcerated in California contends that prison officials have denied them treatment for their mental illness that comports with the United States Constitution.

1  (Doc 42 at 110)  As a result of the May 21, 2009 proceeding, Plaintiff filed another grievance and
2  alleged that Drs. Ferguson and Lackovic removed him from the ETP in retaliation for his
3  complaints against them.  (Doc. 45 at 40-47)  This appeal was denied.  Id.

4  In June 2009, Plaintiff was transferred to the caseload of Dr. Bola.  (Doc. 45 at 67-68)
5  Plaintiff asserts that Dr. Bola determined that Plaintiff's diagnosis was exhibitionism.  (Doc. 45 at
6  69)  Plaintiff attended one-on-one sessions with Dr. Bola and, eventually, Dr. Bola placed
7  Plaintiff in her six-week "Brain and Behavior" therapy group.  Doc. 45 at 69, 109.  Plaintiff acted
8  appropriately during these sessions and satisfactorily completed the group therapy. Doc. 45 at 69,
9  109, 112.  Plaintiff claims that Dr. Bola attempted to convince Dr. Ferguson that Plaintiff should
10 be reinstated into the ETP but Dr. Ferguson disagreed that Plaintiff met the criteria for this
11 treatment. Id.

12 Notably, from May 20, 2009 through May 19, 2010, Plaintiff remained involuntarily
13 medicated and during this period, did not receive a rules violation report for indecent exposure.
14 Fact 42, Doc. 38-5 at 72.  However, when the court order for this medication was not renewed, he
15 received five disciplinary reports for indecent exposure from May 28, 2010 and June 22, 2010.
16 Fact 44.  Plaintiff attempt suicide on June 21, 2010 and was admitted to the hospital as a result.
17 Fact 45.

18 In July 2010, Dr. Perlmutter evaluated Plaintiff and determined, "Inmate demands specific
19 programs and levels of care that are not appropriate given his mental health issues and takes
20 extreme behavioral measures ( e.g. frequent public masturbation, suicide gesture, suicidal threats,
21 verbally profane and abusive toward nurses in attempts to get his way." (Doc. 38-5 at 89)  Dr.
22 Perlmutter concluded, "Primary issue appears to be power/control and Cluster B Axis II
23 Considerations, although he is also diagnosed with Bipolar." Id.  Dr. Perlmutter continued,
24 "Inmate is able to advocate for himself in a logical and rational manner, but is willing to appear
25 angry and becomes verbally abusive when he does not get his way.  Many behaviors are
26 controlling in nature, and include public masturbation and significant verbal abuse of staff."  Id.
27 During this hospitalization, the Coordinated Clinical Assessment Team ("CCAT")--made
28 up of mental health care professionals from CDCR and the California Department of Mental

Health—determined Plaintiff would receive treatment in the exhibitionism program. Fact 48. Ferguson opined that group therapy was not appropriate due to Plaintiff's impulse control issues, his behavior in "talking over' others and his mood swings. (Doc. 38-3 at 5) As a result, Plaintiff received one-on-one treatment with Dr. Bola on the topics usually provided in group exhibitionism therapy, but he was not returned to group therapy.  (Doc. 45 at 70) Plaintiff successfully completed the 48 lessons associated with this treatment.

## II.     LEGAL STANDARD

### A.     Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one which may affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute regarding a material fact is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party.  Id.

A party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Where the moving party will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  "On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." Id. (citing Celotex, 477 U.S. at 323).

If the moving party has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." FTC v. Stefanchik, 559 F.3d 924, 929 (9th Cir. 2009) (citing Anderson, 477 U.S. at 257

(1986)) (emphasis in the original). Although the nonmoving party need not establish a material issue of fact conclusively in its favor, it may not simply rely on "bald assertions or a mere scintilla of evidence in [its] favor" to withstand summary judgment. Stefanchik, 559 F.3d at 929. Indeed, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citation omitted).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." Soremekun, 509 F.3d at 984. Rather, "the evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." Anderson, 477 U.S. at 255. See T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987). Inferences, however, are not drawn out of the air; it is the nonmoving party's obligation to produce a factual predicate from which the inference may justifiably be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985).

The court must apply standards consistent with Federal Rule of Civil Procedure 56 to determine whether the moving party has demonstrated that there is no genuine issue of material fact and judgment is appropriate as a matter of law. Henry v. Gill Indus., Inc., 983 F.2d 943, 950 (9th Cir. 1993). In resolving a motion for summary judgment, the Court examines the evidence provided by the parties, including pleadings depositions, answer to interrogatories, and admissions on file. *See* Fed. R. Civ. P. 56(c).

### B. Eighth Amendment – Inadequate Medical Care

To state a claim for the violation of the Eighth Amendment based on inadequate medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). In other words, the plaintiff must demonstrate: (1) a serious medical need; and (2) a deliberately indifferent response by the defendant. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006).

A medical need is serious "if the failure to treat the condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974

F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997). Indications that a person has a serious need for medical treatment include: the existence of an injury that a reasonable doctor or patient would find worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. McGuckin, 974 F.2d at 1059-60 (citations omitted).

A defendant acts with deliberate indifference when he knowingly fails to respond to a serious medical need, thereby inflicting harm on the plaintiff. See Farmer v. Brennan, 511 U.S. 825, 837-42 (1994); Jett, 439 F.3d at 1096. Deliberate indifference may appear when a defendant denies, delays, or otherwise interferes with medical treatment. See Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988). Nevertheless, "[d]eliberate indifference is a high legal standard." Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004). "Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980) (citing Estelle, 429 U.S. at 105-06). A difference in opinion between a physician and his patient over the best course of treatment is also insufficient to demonstrate deliberate indifference. See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

A prisoner's need for mental health care may constitute a serious medical need within the meaning of the Eighth Amendment "if the failure to treat [the] prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" Doty v. County of Lassen, 37 F.3d 540, 546 (9th Cir. 1994) (citations omitted). For purposes of this motion, that Defendants do not dispute Plaintiff suffered from a serious medical need. (Doc. 38-1 at 6 n. 5)

At its root, Plaintiff's complaint related to the denial of mental health treatment, is that he was denied group therapy for exhibitionism and, though he received one-on-one treatment (Doc.

38-5 at 125 [received one-on-one treatment since April 9, 2009[5]]), he contends that this treatment was not for exhibitionism. (Doc. 45 at 68) However, the appropriate treatment Plaintiff should have received was determined by his diagnosis at the time. (Doc. 38-3 at 5) Corresponding to the changes in diagnoses were changes in treatment to that which was appropriate at the time. Id.

Notably, the evidence demonstrates that several doctors, in addition to Defendants, opined at various times that Plaintiff's primary diagnosis was <u>not</u> exhibitionism. Drs. Flavan, Talisman, Perlmutter, Ahlmeyer and Lowe all opined, at various points in 2009 and 2010, that Plaintiff's primary diagnosis was Bipolar Disorder. (Doc. 38-5 at 35, 36, 39, 55, 89; Facts 35, 42) Importantly, even Dr. Bola—whom Plaintiff seems to consider as his champion on the exhibitionism diagnosis—indicated his primary diagnosis was "Psychotic disorder NOS" on April 7, 2009. (Doc. 38-5 at 46) The mere fact that Plaintiff had numerous incidents of indecent exposure does not mean that the doctors violated the Constitution when they focused his treatment on his primary diagnosis at the time rather than exhibitionism treatment. Moreover, several doctors—Drs. Flavan and Perlmutter, in particular--opined that Plaintiff's acts of public masturbation and indecent exposure related to his desire to gain control—i.e., act in a certain way, get a certain response—rather than an inability to control this behavior.

Moreover, it is without dispute that the EOP provided Plaintiff a higher level of care than he received at the CCCMS. Thus, given the *increase*d level of mental health attention he received, the Court cannot find that the doctors were deliberately indifferent to his care. The fact that Plaintiff contends that he should have received treatment specifically for exhibitionism— which he felt was best provided in the ETP at the CCCMS--does not demonstrate a constitutional violation. Instead, an inmate's disagreement with a chosen course of medical treatment does not

---

[5] Plaintiff's declaration indicates that he did not receive *any* therapy from September 2009 through August 2010. (Doc. 45 at 2) However, this directly contradicts his deposition testimony. "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." <u>Kennedy v. Allied Mut. Ins. Co.</u>, 952 F.2d 262, 266 (9th Cir. 1991). Thus, the Court does not find that a question of fact exists on this point.

The Court **DENIES** Plaintiff's objection to the reliance upon his deposition testimony. There is no indication that the deposition testimony is unreliable and there is no evidence that Plaintiff ever requested to review his transcript. (Doc. 48 at 2)

1   demonstrate a violation of the Eighth Amendment.  Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.

2   1989) ("A difference of opinion does not amount to a deliberate indifference to Sanchez' serious

3   medical needs.")

4        Moreover, though Plaintiff attributes his failed suicide attempt in June 2010 to the lack of

5   exhibitionism treatment, it is noteworthy that during the entire period leading up to this, when he

6   was provided the court-ordered medication and underwent one-on-one treatment for his primary

7   diagnosis, he did not receive any rules violation reports for indecent exposure or public

8   masturbation.  Fact 42, Doc. 38-5 at 72.  However, when the court order for this medication was

9   not renewed, he received five disciplinary reports for indecent exposure from May 28, 2010 and

10  June 22, 2010.  Fact 44.  This demonstrates that, rather than his exhibitionism being out-of-

11  control, this behavior was well-controlled with the medication and therapy he had been provided

12  until June 2010.

13       Therefore, because Plaintiff has demonstrated, at most, a difference of opinion with his

14  doctors as to his proper course of treatment rather than an unconstitutional deliberate indifference

15  to a serious medical condition, the Court recommends Defendants' motion for summary judgment

16  be **GRANTED**.

17       **C.**     **Retaliation in violation of the First Amendment**

18       Prisoners have a constitutional right under the First Amendment to be free from retaliation

19  for participating in "protected speech activities." Pratt v. Rowland, 65 F.3d 802, 806 & n. 4 (9th

20  Cir.1995). To obtain summary judgment on a claim of retaliation, Defendants have the burden to

21  demonstrate that there are no genuine issues of fact supported by evidence as to at least one of the

22  essential elements of a retaliation claim and, as a result, the plaintiff cannot prevail on the claim.

23  Celotex, 477 U.S. at 323. "[A] viable claim of First Amendment retaliation entails five basic

24  elements: (1) An assertion that a state actor took some adverse action against an inmate (2)

25  because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's

26  exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate

27  correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir.2005).

28       Here, Plaintiff contends that Drs. Ferguson and Lackovic retaliated against him by

removing him from the ETP and refusing to return him to the ETP based upon the fact that he filed a grievance against Lackovic. Toward this end, he asserts that on April 9, 2009, Lackovic told him that she would not permit him to receive treatment for exhibitionism while he remained at Corcoran because he had filed the grievance against her. (Doc. 45 at 68) He claims also that on May 6, 2009, Dr. Ferguson told him that he "didn't appreciate the context" of his grievance and that Plaintiff would be precluded from the exhibitionism group treatment indefinitely. (Doc. 45 at 68) Accepting this evidence as true, however, does not demonstrate that either Defendant retaliated against him.

Though Plaintiff seems convinced that Ferguson and Lackovic had the ability to determine his level of care, he provides no evidence of this other than his unsupported belief. (Doc. 38-5 at 123) On the other hand, Defendants present significant evidence that it is the IDTT or the CCAT, rather than the individual clinician, which determine the inmate's level of care. Fact 5. Undeniably, the IDTT and/or the CCAT changed Plaintiff's level of care several times including, March 11, 2009, April 30, 2009, May 1, 2009 and July 2010. Facts 3, 28, 36; Doc. 45 at 62. Thus, there is no evidence upon which the Court can conclude that Defendants retaliated against Plaintiff for filing grievances and the Court recommends Defendants' motion for summary judgment be **GRANTED**.

### III.     Findings and Recommendations

Based upon the foregoing, **IT IS HEREBY RECOMMENDED** that Defendants' motion for summary judgment (Doc. 38), be **GRANTED**.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within fourteen days after being served with these findings and recommendations, Plaintiff may file and serve written objections with the Court. A document containing objections should be captioned "Objections to Magistrate Judge's Findings and Recommendations."

///

///

Plaintiff is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **October 5, 2012**               **/s/ Jennifer L. Thurston**
                                           UNITED STATES MAGISTRATE JUDGE